Good morning, Your Honors. May it please the Court, my name is Doug Carston. I'm arguing on behalf of the applicants here, Supernus and United Therapeutics. At issue in this case is nearly two years of patent term for a life-saving pharmaceutical product that the patent office charged as applicant delay, despite admitting below in the district court that for at least 546 days of that term... you could probably be charged with the 30 days which otherwise would be saved by the safe harbor because you missed the safe harbor. Would your contention is that you can only be charged for the time after the filing of the opposition in the European patent office? Yes, Your Honor. So essentially, yes. I mean, there are a number of different ways in which you might carve this up. And frankly, I apologize for some of the math in the brief. Certainly, I think for 546 of those days, that's the period of time before we received, the European Council received the notice from the European patent office. The patent office admits... This is the period that starts February 22, 2011. Exactly right. The patent office admits, and we submit, that there was nothing further that we could have done to advance prosecution. And that's got to be off the table under statute 154B2C1. The statute requires, in terms of the period of time, that the deduction be equal to the amount of time in which we failed to engage in concluding prosecution. So let me ask you, as I understand it, your contention is that the statute says you can't be docked for a period of time during which you failed, which you did not fail to engage in reasonable efforts. I think that's right, Your Honor. Now, I probably didn't say it right. In order to rule in your favor, do we have to invalidate the regulation? Your Honor, what we're asking for is for you to agree with us that we're entitled to this quantum of additional patent term, and then remand it... And you don't care how we get there. Well, in all candor, that's correct, Your Honor. However, I think that the patent office recognizes that there's an issue with C8. They do that in their brief. I think it's at page 39, where they say, look, there are times when an applicant is going to get charged, but you know what? This is our regulation, and it's reasonable, so hard cheese. We think, you know, sorry, that's not right. You have to be consistent with the statute. And then they come back, and they say, well, D1 makes it sort of consistent. Well, D1 really doesn't. Maybe I'm wrong, but D1, I don't see it really as a fact here, because you're saying, okay, assume we didn't meet the safe harbor provisions of D1. Still, you can't dock us for a period of time, February 22, 2011, through 8, 21, 12, when, as the parties agree, and you cite that paragraph 9, we couldn't do anything. We were waiting for a ruling on the RCE. Precisely right, you're right. In fact, I actually think D1 highlights the problem with C8, as opposed to being a broad savings provision. Isn't this case really about choices, and the choices that your client made as to when to file the IDS? I mean, you could have filed it within the safe harbor, or you could have waited to have filed it, and you didn't, and now you're caught in this situation. I mean, this is classic being raised by your own petard here. I hear you, Your Honor. I mean, there are lots of ways in which we might not. I might have the privilege of standing before you here today. One, the patent office could have actually acted within four months, right there. Two, we might have filed within the 30-day, they call it a safe harbor, I'm going to call it a life preserver, I guess, because it certainly doesn't seem like it fits any boats, in my view. We also could have set our hands, and here's why I think it's really crazy. We could have intentionally delayed. We could have set our hands and just waited and waited and see what happens with the patent office. And if so, we still would be able to recapture that patent office delay. It wouldn't be charges applicant delay. But because we timely filed our IDS under other patent office regulations, we are here with 18 months plus. So you're arguing that you would have been in good shape if you'd ignored the regulation about the time for filing the IDS. Exactly, Your Honor. And that makes zero sense whatsoever. It's not too sympathetic. Well, Congress said it's important for us not to charge applicants unless they're actually doing something nefarious and trying to create submarine patents. That's in the Rohrabacher Statements in Legislative History. What I'm suggesting, and I think what the patent office admits in their paper, is this provision of the patent office, which it deems to be a safe harbor, would actually reward folks for sitting on their hands and doing the opposite of the incentive. I think that CH, and I submit that CH is against the statute 154 B2C1, period, full stop. And D1 does not save it. But if you want to look at D1 and look at the reasonability of what the patent office has done here in terms of its regulatory scheme, D1 demonstrates that it's not doing what it's supposed to do. It hasn't saved the application of CH, because CH has two parts. In the first part, there's an assumption baked in. And the assumption is that the applicant can have done something from day one. Here, we don't have that. And the second part is the patent office goes further and identifies the period of time in which the applicant's going to be docked. And that's nowhere present in 154 B2C3. In fact, Congress was very specific. In B2C1, they say, here's the period of time that you can be docked in this circumstance. And then in C3, it says, Mr. Patent Office, go ahead and identify those circumstances. It says nothing about qualifying that period of time. And when we do look at the period of times in which... There argument basically is that we're trying to have a bright line rule here. We don't want to have each time period calculation result in a complicated litigation. And so this is reasonable. That's basically what they're saying. And I mean, are they right? Would these computations potentially become complex if you had to do it on a case-by-case basis and determine whether the patent applicant had acted reasonably? I have three points to make on that, Your Honor. One, first of all, just because setting a general rule... If setting that general rule goes against the statute, you're out of luck, Mr. Agency, period. That's the Novartis case, essentially. That's the Wyeth case. We cited those. Patent offices opted not to address those in their papers. Two... I've lost my train of thought. I apologize. I'm slowly under the weather. But so with respect to the general rule setting, that doesn't save you if there are situations where applicants get swept up. In terms of the case-by-case basis, if you look at the record in this case... Let me see if I can find the site. I think it's 517 to 522 of the joint appendix. You'll actually see that there is a particularized assessment. I understand the patent office doesn't want to be charged or have litigation every time they do a patent term adjustment calculation. But if you look, the way that the regulations are set up, there's A delay and B delay and C delay, and you have to subtract out the overlaps. And then you look to see what applicant delay is there and offset it by that much. I'm not so sympathetic to an argument that we can't do a particularized assessment when in case there is PTA, there is already done a particularized assessment. Well, but I guess their argument would be that you're adding another complexity on top of what is already a complex statute. Well, if you want to take advantage of... Is it true? I mean, is it true that it would make it more complicated if we were to approach it the way you'd like us to approach it? I don't believe it does at all. If you look at those pages of the appendix, which I've set forth for your honor, you'll see what the patent office does. Now, sure, some of it's mechanical, but if the patent applicant wants to take advantage of D1, the lifesaver, then they need to come forward with facts to support the application of D1, which the patent office is ready to look at and accept. So we're willing to do a particularized assessment on a case-by-case basis, except in this limited circumstance. It's essentially the argument I'm hearing, and that makes zero sense to me. I have very spare lucidity. But if we had a situation in which the patent office, every time it was confronted with an adjustment situation, had to determine whether the applicant's efforts were reasonable, I mean, that could get pretty complicated. Well, we're not looking at reasonability here, though, in that sense, your honor. I mean, that be charged, or 646 be charged as applicant delay, that ought to raise a red flag. I don't think we're talking about hundreds or even dozens of cases where that's the case. Here, for whatever reason, the patent office... We can't turn on the amount of the delay. I mean, they have an interest in having a workable system. And what they're saying is, if every determination required us to look at what the didn't do and make an assessment as to whether that was reasonable, that would be unworkable. And it seems to me that it would be difficult to construe the statute that's requiring that kind of case-by-case determination of reasonableness. Don't you agree with that? Well, I see I'm into my rebuttal time. But I am sympathetic to a complexity here, but I think there's an easy fix to C8. It's not my place to tell the patent office what to do, of course. But where there's a situation where the applicant did not have access to that information, the patent office seems very willing to have the applicant provide that information and consider it already on a case-by-case basis with respect to D1. That's the fix. Just ask. Just have in C8 a situation where you make the applicant flesh out the ability to have access to that information. Moreover, Your Honor, the statute is the statute. And Congress said equal to. Equal to the amount of time in which you fail to engage in concluding prosecution reasonably. By regulation and just by ease of administration, you can't violate what Congress told you to do. Carson, let me ask you one question. I assume that you would have no problem with the regulation C8 if it said submission of a supplemental reply or other paper other than a supplemental reply or other paper expressly requested by the examiner after reply has been filed, in which case, and this is the key part, this period of adjustment set forth in section 1.703 shall be reduced in accordance with the provisions of and then cite the statute. That seems right to me, Your Honor. I mean, that seems exactly right. That's what you would say is the way that regulation should be worded. And in that case, those 546 days at least, maybe even the 30 days in which you could have been reasoned, you could have taken advantage of the safe harbor, all would not be docked against the briefs. You're only arguing with respect to the 546 days, correct? I think there could be some line drawing. You might say, for example, well, look, you took notice on day 546. You had 30 days to take advantage of the safe harbor. It was day 31. 546 is what we're, to simplify everything in terms of the math. That's what we're asking for. But there are other ways in which, and I think it's after 546, that's what Congress wanted the patent office to do in C3. Tell me what that particular circumstance, at what point, what's the circumstance at which your applicant has failed to engage? It's not that 546 part. Is it day 31 after you received notice, et cetera? That's what Congress asked them to do. And that's not what the I'll talk about this all day, Your Honor, as long as you'd like to. So explain to us real quickly why Gilead doesn't resolve this matter. So Gilead was a completely different case, Your Honor. In Gilead, it was Gilead's own co-pending application. They had it in their pocket the whole time for each one of those 57 days. Remember, I talked about C8 and how it has two parts. And the first part bakes into it an assumption. The assumption being that the applicant could not have done anything from day one. But Gilead, they could have done everything from that point. The assumption applied to Gilead. Point two, I read Gilead fairly carefully. And in Gilead, there was no hook, no statutory provision that Gilead could point to and say, aha, you are at odds with the mandate of Congress with particular statutory language. Here, we've got that. It is 154B2C1 and C3 taken together even, or separately for that matter. That's where they ran afoul by virtue of the C8 regulation. So I think, one, we have an utterly different factual scenario. Two, we actually point to a statutory provision, or two, where the patent office has run afoul. Doesn't Gilead address the issue of conduct that results in actual delay? We're not challenging whether it's actual delay or potential for delay. Here, we had a bunch of against the statute to tack that 18 months off of our patent term. Actual delay otherwise, I don't know that you could show actual delay here. Certainly, the patent office delayed quite a bit. But I don't think that the issue in Gilead, actual delay versus potential for delay, doesn't apply whatsoever. What troubles me is when you say that you accept Judge Schall's amendment to the regulation, which would say we get charged with delay unless we acted reasonably using the statutory language. It seems to me that just potentially opens up all sorts of problems where someone in your position could say, well, yeah, they sent us the opposition from the FedEx, didn't deliver our copy, and it was reasonable for us to be delayed because we didn't get the thing straightened out with FedEx until two months later, so on and so forth. You can imagine all sorts of horror stories where applicants might say, well, we behaved reasonably even though we were late. It seems to me that if the patent office is trying to avoid getting into that kind of situation, which is a reasonable objective on their part. Well, it certainly is a reasonable objective, but you can't go against the mandate of the statute. Congress said equal to the period in which the applicant has failed to engage in concluding the prosecution of the application reasonably. If that's the concern, then there are mechanisms within the patent office where they can say, look, they do it in D1. They say, let us know what the facts are, and we'll assess them, and we'll see if you're entitled to this safe harbor or not. And then we can challenge that. So that's already there in the regulation with respect to the 30 days. But you can't just say, it doesn't say... So the patent office has informed the bar, has informed the profession how it can avoid an adverse PTA by saying, you file your IDS within this time period or the other, and you filed it outside of those time periods, and you're saying that any delay that happened here wasn't as a result of your making, that you didn't actually cause the delay, and therefore, you shouldn't be docked for it. Well, what I'm saying is... I think that Gilead does answer that question. Well, here, the statute says we are docked for that period equal to the amount of time in which we failed to engage reasonably in concluding prosecution. The patent office admitted below that for 546 days of that 646 in which we were docked, there was nothing further we could have done but to advance prosecution. I don't believe Gilead answers that question at all. Again, Gilead presented the question of actual versus potential for delay, which had no statutory hook whatsoever. Here, we have the very language of the authorizing statute, 154B2C1. That says equal to, and everyone on this side of the bench agrees that there was nothing more that the applicants here could have done for a year and a half, for 546 days of that period. Therefore, by docking us that amount, they are adverse to the statute. They're against what Congress told them they must do. Okay. Thank you. Thank you very much, Your Honor. We'll give you two minutes for Mr. McOtter. Thank you, Your Honor, and may it please the Court. Joe McOtter on behalf of Apolli Joseph Mattal, with me, Mr. Rosillo from the PTO. Judge Reyna, you have it exactly right. Here, the appellants failed to follow a PTO regulation designed specifically to avoid PTA loss in this exact kind of circumstance. D1 gave appellants 30 days simply to send the European Patent Office letter and a simple timeliness certification to the PTO. There would have been no PTA reduction. The patent bar is on notice of those regulations. They're duly issued. We argue they're entitled to Chevron deference. Do you agree that there's nothing the applicant could have done to avoid this delay because it didn't get the European Patent Office opposition until, what is this, February 21st? Well, so they could have, the appellants could have submitted a status request. I mean, aside from the safe harbor. Well, all right. Aside from the safe harbor, of course, if they'd done that, we would not be here at all. But they also could have submitted a status request. They could have called the examiner. The notion that they're simply locked out and this is a black box is incorrect. But even setting that aside, we think... Report from the European Patent Office? No, sorry. They could have filed a status request with the patent examiner, Your Honor. When would this be? There's no specific timeline. Essentially, if the applicants are trying to push their application along, they could contact the examiner. I don't understand what you're saying. I'm sorry. How does that bear on whether they could have done something earlier? Well, they make the argument that during the entire 546 days, there's absolutely nothing they could have done to try to reduce this amount of delay or to try to move the application along. And that's incorrect because they could have filed a request for status. They could have reached out to the patent examiner. But we're addressing a specific thing, whether they could have filed this IDS earlier. And there was no way they could have filed the IDS earlier because they didn't have the information. It wasn't available to them, right? That's correct, Your Honor. They couldn't have filed it before they received it. But because they missed the deadline in D1, the PTO applies a bright line rule that we believe was blessed by this court in Gilead that says if applicant behavior results in potential PTO delay, which I don't think there's any doubt occurred here, or at least potentially occurred here, then the PTO reasonably, rationally can subtract the time that has actually been wasted or potentially wasted. And that would be back to the request for continued examination itself, Your Honor. Suppose instead of the interpretation of the regulation that Judge Schall was talking about earlier, which incorporated the statutory standard, you had something that was stricter than that and said you can't be charged with a delay if there was no possibility of doing anything to avoid the delay. If the statute said that, Your Honor? If the regulation were interpreted to have that standard in it. If there were no possibility that the applicant could have done something sooner. I still think under Gilead, Your Honor, that the PTO rationally could subtract the amount of time back to the RCE. And again, appellants clearly would draw the line differently. Perhaps even the court would draw the line differently. But because these regulations are issued pursuant to Congress's express delegation under 154B2C3, they're entitled to the strongest administrative deference. And again, this case is under arbitrary and capricious. The PTO only needs a rational reason for subtracting that time. And whenever applicants submit IDSs like this, it interferes with the PTO's ability to timely process applications. Not just appellant's applications. But that's not the only question. The question is whether the applicant behaved reasonably or not. Right. And Congress specifically said that the PTO gets to define that term, except for one narrow example that was defined in 154 itself. Once the PTO defines the failure to engage reasonably as filing an IDS during this time period after an RCE, it's almost a natural byproduct, or at least a rational byproduct, that the next step would be the subtraction of PTA time would go back to the RCE itself. That's the potential amount of time that's been undone, that's been wasted by filing this IDS. So, Ricardo, the statute says, shall be reduced by period equal to the period during which the And for the 546 days, the parties agree he couldn't do anything. That hasn't been in the briefs, that hasn't been disputed. So, isn't the situation where here the applicant is being docked for a period during which, unlike what's in the statute, he couldn't do anything? They're being docked for a time period that resulted in a potential delay to the PTA, I mean to the PTO. But he didn't cause any delay during that 546-day period, did he? It was waiting for the PTO to rule on the RCE that had been filed in February of 2011, correct? Correct. And during that time, type A delay is accruing, undoubtedly, against the PTO. And so all the PTO is saying is then, if that time potentially gets wasted, gets undone by the filing of an IDS. But how did it get undone? Because he's saying, during that period ending on, I guess, August 21st, 2012, during that period in there, how did the IDS undo any of that? He's saying, I'm on the hook for the period, you know, when I didn't file during the safe harbor or lifesaver provision, whatever you want to call it. But the period that he's being docked for, the 546 days, the parties agree he couldn't do anything. Your Honor asks, how did the IDS undo the time between the request for continued examination and when they received this European patent letter? And that's an argument that we think is squarely addressed by Gilead. It undid it because... The IDS didn't affect that. I'm sorry? The IDS didn't affect... Nobody, everyone agrees, and correct me if I'm wrong, that he couldn't do anything during the 546-day period. So how can you dock someone for that period when the statute says you're only liable for a period during which you fail to engage in reasonable efforts? Well, on the first point, Your Honor, we agree there's nothing you could have done about the European patent office letter before you received it, of course. Well, as I said, during that time, they could have tried to move the application along. We should have made that argument before in the briefs. Is that in the briefs? It's not, Your Honor. I mean, I don't think anyone's argued that... I don't recall anybody... I mean, I could be wrong. I could have missed it in the briefs, but it didn't seem to be anywhere in the briefs that the office was saying there was something he should have done during that 546-day period. As far as I can tell, that's the case. Am I wrong? I think during that time period, correct, there was nothing that he could have done about the European patent office letter because... But the office didn't say he could have done anything. Well, I think ultimately, Your Honor, setting aside, we think that's irrelevant. That's an argument... Why is it irrelevant if the statute says you're on the hook for a period during which you fail to engage in unreasonable efforts, right? Correct. And everyone agrees here that during the 546-day period, he did not fail to engage in reasonable efforts. We do not agree on that point, Your Honor. Why? What did he do that he... What did he not do? During the time period of... 546 days. He was waiting for the RCE ruling, correct? Correct, Your Honor. But what did he not do then? Well, looking back retrospectively is often how we can determine whether a party was failing to reasonably engage. And the PTO can say that that time period that's been undone can count as time that... How has it been undone? He couldn't do anything during that period. What could he have done during that period that he didn't do? Just answer that. Well, besides filing a status request and trying to move the application on... You're saying he should have been banging on the examiner's door. Well, I don't think it has to be that aggressive. Well, but I mean, that's... Inquired, yes. But that hasn't been argued before this. But as to the European Patent Office letter itself, yes, we agree they could not have submitted the information before they got it. How often does this come up? I'm sorry, Your Honor? How often does this particular problem come up? Under D1 specifically? Yeah, that's the sort of situation that we have here. Is this a one-off case or are there other cases like this? It's actually relatively common, Your Honor, for parties to learn about information, say in litigation that's going off on the side. They'll submit an IDS with that new information. They'll say that's information we could not have learned about before. And that time between that IDS back to the request for continued examination gets subtracted as a matter of course. As far as I'm aware, no other party has ever challenged it. And this case we think is even easier because of the D1 provision that allowed them to possibly by simply filing... But there are other situations in which people have missed the safe harbor and the same issue has come up? I'm not aware of any that have made it to court, Your Honor. No, but the patent office. It comes up at the patent office. It does come up, Your Honor, yes. Are there other situations in which there are disputes about reasonable efforts? Well, so I think if I understand your question correctly, Your Honor, you're getting at the case-by-case inquiry that appellants say that is not required, but we think clearly would be. We think it's illustrated by the fact that appellants themselves don't seem to be able to agree on how much time they think they're entitled to. They said 646 days below. They said 546 days. And now they're saying we at least shouldn't be docked for the period of time when we couldn't do anything. But I guess what I'm saying is I'm trying to understand this. We're here interpreting the statute. We're here interpreting regulation. I'm trying to understand the kinds of situations in which this comes up. Are there other cases, types of cases, other than the delay in receiving information where applicants are arguing that they shouldn't be docked because their efforts were reasonable? Does the concern about a case-by-case adjudication of this issue bear on other situations? Absolutely, Your Honor. I think the example of parties who learn about information through other litigation and they'll submit an IDS, and they can raise the exact same kind of arguments that appellants have here. I understand that. But apart from that, apart from situations where they're saying we didn't get the information, so we couldn't have done anything earlier, are there other situations where the question of what constitutes reasonable efforts comes up? I think even in a fact pattern as the court saw in Gilead, parties could raise that kind of argument. If I understand in Gilead, during our argument, the appellant was arguing that, well, what if we have a situation where there's information sitting in the mailroom and we don't know about it? And I think Your Honor even mentioned that kind of example. Well, that's an argument where they're going to say, we couldn't reasonably have submitted that, and therefore we couldn't reasonably have failed to engage in efforts, yet it was sitting in the mailroom. And so now the PTO is what's going to have to take affidavits from people at the law firm, or is going to have to introduce extra record evidence. We think the PTO is entirely entitled to issue bright-line rules like C8. And then, especially in a case like this, where they make an exception for D1 because they badly want this kind of information to be submitted timely, foreign patent office information, then when you put those together, the entirety of the scheme is certainly rational, which we believe is the only requirement that needs to be satisfied here under Chevron. When you say the entirety of the scheme, then noting that PTO has its own deadlines that the statute imposes with respect to these proceedings, how do those deadlines interact with the interpretation of the word reasonable that we're looking at? Well, I think it's a good way to frame the case, Your Honor. During most of the time period between the RCE and the IDS, the PTO was accruing type A delay, and that's undisputed. That's time that's counting against the PTO. And all that happens here is that time then gets reduced by the amount of delay or potential delay by applicants' behavior in filing this IDS. And so they do kind of work together, Your Honor. It's the PTOs in a way trying to prevent what you might call double dipping in terms of time here. They're saying, we're not going to give you type A delay when you submit an IDS that causes us to go back and start over again, or at least potentially. And here, the PTO's next office action after this IDS did incorporate and respond to the information that was submitted in the IDS. And so in this case, there actually is evidence that the PTO had to go back and start over the process. Do you see a scenario where a septic supernurse's argument that can lead to a windfall of PTA? Well, I think you'll have parties who serially submit IDSs, and then they'll say all that time gets added in, while meanwhile, the PTO has to sit here and respond to one after the other, or at least consider responding, consider its effect. And if parties are filing them over and over, then you end up with this long period of A delay, type A delay, and appellants are going to argue, oh, but you can't subtract any of that time from our IDS because C8 is void or invalid, or at least we reasonably couldn't have turned over some of that information, and let's have a fact finding to determine whether we could. The PTO is entitled to issue bright line rules, and they even have a specific safe harbor here under D1. We think the PTO did not need to do anything further, Your Honor. Well, let me just ask you one question. This is respect to, I guess it's footnote 10 in your brief on page 44. This came up in Mr. Karsten's argument. He was saying, sort of collaterally saying, you know, look, we could have waited until the end of prosecution and filed the IDS then. And I guess, as I understand it, that is correct, and we wouldn't be in this. I mean, in footnote 10, you say if that had been done, the applicant would have mooted any application of C8. Is that correct? It is theoretically possible that they could hold on to this information and file it at the right time. That would be in violation of the PTO rules, right? It would depend on how late they filed it.  It sets wider timelines for when a party can submit the information. That doesn't mean they're going to get PTA time for it. And that kind of dichotomy is in the statute itself, section 154, D2, C2. And so it's possible. This applicant couldn't have waited the period of time that would have been necessary to file it later without violating the rules, right? Well, they definitely would have violated D1. And I think under their duty of candor under 1.56, I wouldn't say it'd be a violation, Your Honor. I think it would be very risky. Because if the next office action was a notice of allowance, then they could be subject to a huge delay under a huge reduction of PTA delay under C10 or C12. So it's theoretically possible, but very risky. The appellant and Gilead, Your Honor, made that exact same argument. And it's briefed to this court. And we'd submit the court did not find that a persuasive point in that case. What I was saying is, I guess, leaving aside for the moment when they did file the IDS, I guess the PTO on September 13 of 2013 issued the first office action after the filing of the February 22, 2011 RCE. And would they have been untimely if they had filed the IDS? In other words, would we be in this situation if they had filed the IDS the day after that? I don't believe that they would necessarily be subject to a reduction, Your Honor, in that case. But again, that's kind of hindsight bias here. If they knew the next office action would be that exact kind. Whereas if the next office action were a notice of allowance, they could be subject to a huge reduction yet again. So it's one of these kind of gamesmanship issues where if an appellant really wants to try and be very risky and kind of bet it all on reducing this amount of time. The problem is, I guess, 1.97 or whatever it is, kind of puts you in a little bit different world than 704C and it's hard sometimes to juxtapose them is what you're saying. Correct. Filing like an IDS can be timely under 1.97 but not entitled to PTA time under C8 or D1, Your Honor. And we think that example is... We obviously don't have that case here. I mean, we don't have that issue here the applicant waiting to file the IDS until September 13th. But it's just come up in the course of a little bit in the briefing and in the argument. Right, Your Honor. But we don't think that renders C8 or D1 irrational or arbitrary and capricious. The fact that a party could get very lucky and try to time it and therefore avoid any penalties. If there are no further questions. Thank you, Mr. McClellan. Thank you. Mr. Karsten, you got two minutes. Yes, Your Honor. Thank you so much for the extra two minutes. I may please the court. I thought I heard the government argue that the word reasonable in the statute is now irrelevant. That's a heck of an argument to make. There's an undisputed fact here. And that is 546 of those days. I think what the government is arguing that a case-by-case determination of reasonableness would be a mess. Well, you know, I hear you, Your Honor. The patent office can go back to the drawing board, if it so desires, and fix it. They've already changed D1. Well, so D1 was implemented in 2000. They came back and fixed it in 2011. I also heard counsel argue that, well, there are situations where folks learn about stuff in litigation. Well, that's not D1 at all. I mean, if you actually look at the brief, D1 applies only to materials that are learned about in foreign prosecution or in a related application in the patent office. And D1 reflects, to address the concern about serial IDSs, D1 reflects a policy decision by the agency, by the patent office, that it wants to encourage people to file IDSs in those limited circumstances, serially or otherwise. I also heard a question or a suggestion that maybe we could have pinged the examiner with a status report, or picked up the phone and called the examiner. Well, had we done that the day before we learned of the European material, that would be an other paper that wasn't asked for by the examiner under 1704 C8. Not arbitrary capricious. By the virtue of filing a status report and saying, hey, Mr. Examiner or Ms. Examiner, please, please, please conclude prosecution. Under C8, we have just converted patent office delay into applicant delay by seeking to advance the prosecution. It turns the world on its head. By filing an other paper that is a status report request, we've then fallen within the realm of C8 because the patent office didn't ask for it. Okay, Mr. Carston, I think we're out of time. Thank you so much. Thank you both, counsel. The case is submitted. That concludes our session for this morning.